# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 2, 2023           Decided July 12, 2024

No. 23-1025

TROUTBROOK COMPANY LLC, D/B/A BROOKLYN 181
HOSPITALITY LLC,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 23-1030

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Thomas G. Eron* argued the cause for petitioner. With him on the briefs was *Raymond J. Pascucci*.

*David A. Seid*, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Jennifer A. Abruzzo*, General Counsel, *Ruth E. Burdick*, Deputy Associate General Counsel, *David S. Habenstreit*,

Assistant General Counsel, and *Milakshmi V. Rajapakse*, Supervisory Attorney.

Before: RAO and GARCIA, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARCIA.

Dissenting opinion filed by *Circuit Judge* RAO.

GARCIA, *Circuit Judge*: The National Labor Relations Act specifies the topics over which an employer must bargain in good faith with an employee representative. The National Labor Relations Board held that Troutbrook Company, LLC violated the Act by resolutely refusing to discuss certain of those mandatory subjects—including wages, health benefits, and retirement benefits—throughout months of negotiations over an initial collective bargaining agreement for one of its hotels. Troutbrook now petitions for review of the Board's decision. Because substantial evidence supports the Board's determination, we deny Troutbrook's petition and grant the Board's cross-application for enforcement of its order.

**I**

**A**

Troutbrook owns and operates a sixty-room hotel in Brooklyn, New York. On September 24, 2018, after the hotel's employees voted for union representation, the Board certified New York Hotel and Motel Trades Council, AFL-CIO ("the Union") as their exclusive collective-bargaining representative. Troutbrook challenged the certification and refused to bargain with the Union. On June 3, 2019, the Board found the company's refusal unlawful and ordered it to

recognize and bargain with the Union. *See Troutbrook Co. d/b/a Brooklyn 181 Hosp., LLC & N.Y. Hotel & Motel Trades Council, AFL-CIO*, 367 N.L.R.B. No. 139 (June 3, 2019). On February 28, 2020, we denied Troutbrook's petition for review and granted the Board's cross-application for enforcement. *Troutbrook Co. v. NLRB*, 801 F. App'x 781 (D.C. Cir. 2020).

A few months later, Troutbrook and the Union began negotiating an initial collective-bargaining agreement. The parties met six times by teleconference: three times in mid-2020 and, after a hiatus due to the COVID-19 pandemic, three times in early 2021. The Union's primary spokesperson during negotiations was Assistant General Counsel Gideon Martin. Martin was assisted by Union General Counsel and Executive Vice President Rich Maroko. Attorney Raymond Pascucci served as the primary spokesperson for Troutbrook.

On May 18, 2020, before the parties' first bargaining session, Martin sent Pascucci the Union's proposal, which comprised its Industry-Wide Agreement with the Hotel Association of New York City, Inc. ("IWA") and a Memorandum of Understanding modifying the IWA's terms for Troutbrook's hotel. During the session, Maroko presented the proposal's terms, covering both economic subjects (*e.g.*, wages, severance pay, and sick leave) and non-economic subjects (*e.g.*, union recognition, non-discrimination requirements, and agreement duration). The Union voiced its preference that Troutbrook sign onto the IWA and offered to answer any questions. Pascucci said that he needed time to review the proposal with the company.

On June 4, 2020, the parties met for a second session. At the start of the call, Pascucci proposed ground rules to guide the parties' negotiations, including that the "[p]arties would focus on non[-]economic issues before moving onto economic

issues." J.A. 96; *see* J.A. 300. Maroko countered that the Union preferred to discuss all issues without limiting the topics.

The parties then turned to the Union's proposal. Pascucci stated that Troutbrook was "not willing to accept the IWA, whatsoever." J.A. 96. He explained that the pandemic had significantly altered the hotel industry's labor market and room rates and that the company sought a standalone agreement tailored to its hotel. Maroko asked whether Troutbrook took issue with specific provisions of the IWA, and Pascucci clarified that the entire agreement was "way too convoluted and unnecessarily complex and burdensome." J.A. 97. Maroko said he understood if Troutbrook wanted to discuss particular subjects of concern, but he objected to the company's wholesale rejection of the IWA as a starting point for negotiations. Pascucci asked if Maroko viewed the IWA as a "one size fits all" document, and Maroko initially said yes. J.A. 97. But he then made clear that "[i]f [Troutbrook] raise[s] issues that are legitimate, [the Union will] be flexible on them." J.A. 98. After Maroko requested a counterproposal, Pascucci stated that the company's response would address "just some of the articles" in the IWA rather than the whole agreement. *Id.* Maroko replied that good-faith bargaining required a complete counterproposal. Pascucci disagreed, claiming that the parties could make more progress by considering a few issues at a time.

Between June 4 and June 18, 2020, Pascucci and Martin exchanged emails. Pascucci presented in writing Troutbrook's proposed ground rules from the second session, including the proposal to defer discussion of economic subjects. Martin rejected that ground rule, though he agreed to some others. In his words, the Union "d[id] not want to constrain the parties' capability to freely explore and discuss any items, such as

specific proposals, terms, or conditions, during bargaining sessions." J.A. 107.

Pascucci countered with a modification: "The parties agree to focus primarily on non-economic subjects before turning to economic subjects, but it is understood that this general framework does not preclude either party from raising and freely discussing any item at any point during the bargaining process." J.A. 105. Martin again rejected the rule as unnecessarily restrictive and asked whether Troutbrook was "refusing to have meaningful discussion on economics until all non-economic subjects are addressed." J.A. 103. Pascucci replied that Troutbrook was prepared to move forward without a formal, agreed-upon rule, but that "[i]n responding to the Union's proposals, the [company] will focus on non-economic subjects first." J.A. 101.

On June 25, 2020, the parties conferred for a third time. After an update on the hotel's operations, Pascucci briefly introduced six "non-economic counterproposals" addressing recognition of the Union, non-discrimination, a prohibition on strikes and lockouts, a probationary period for new employees, hours of work, and the effective dates of any agreement. J.A. 112–13, 120–21. Martin suggested it was "worth walking through" the counterproposals. J.A. 112. Because the effective-dates counterproposal was a placeholder, he asked if Troutbrook knew how long it wanted any agreement to be valid. J.A. 113. The company had not yet considered the issue, Pascucci responded, but it would "be part of [the] wages and benefits" discussion. J.A. 113. Pascucci's reference to those mandatory economic subjects prompted Martin to inquire when the Union could expect to receive Troutbrook's counterproposals on wages, health benefits, and retirement. *Id.* Pascucci reiterated that the company's "plan" was to "[w]ork[] on non-economics first." *Id.* Martin repeated the Union's

preference for a complete counterproposal, noting that "it's difficult to evaluate a response when it doesn't respond to every term and condition." *Id.*

Martin then turned to Troutbrook's non-economic counterproposals. He asked how the Union should interpret Troutbrook's silence on terms that were included in the Union's original proposal but not addressed in Troutbrook's counters. "We're not agreeing to whatever else is in your versions of these topics," Pascucci responded. J.A. 114. When asked how many sets of counterproposals Troutbrook intended to make, Pascucci replied that the "intention is we work on these topics, then we reach a tentative agreement and then move on to the next set of proposals." *Id*. Martin requested that Troutbrook at the very least offer counterproposals on wages, health benefits, and retirement, but Pascucci pivoted back to the company's non-economic counterproposals. Despite the parties' disagreement over bargaining procedure, for the rest of the third session, the parties discussed the details of Troutbrook's non-economic counterproposals but did not come to any concrete agreements.

After a seven-month hiatus due to the COVID-19 pandemic, on February 2, 2021, the parties met for the fourth time. Martin noted that the Union was "still waiting on a complete proposal including economics, health, [and] wages" and that "[i]t's hard to analyze a proposal without that." J.A. 123. Pascucci replied: "[T]he way I do it is first work through non[-]economics, get through a half dozen and resolve and then move on to next sets, and then eventually work through economics." *Id*. In response to Pascucci's concerns about the IWA, Martin stated that "we can bargain flexib[ly]. We should change the IWA for your operational needs." J.A. 124. Martin further offered to "bargain over [language] and talk about it so [Troutbrook] do[es]n't think it's more

convoluted than it is" or to "bargain over things to make them less expensive." *Id.* Pascucci emphasized that Troutbrook already gave counters on multiple non-economic subjects. But Martin underscored how difficult it would be to come to an agreement through piecemeal bargaining. For example, he explained that "it's a lot easier to go to the crew on hours of work if I also know how much they are getting paid." J.A. 125. Pascucci found that reasoning "absolutely not persuasive." *Id.* In an email after the session, Martin again requested that Troutbrook "provide a complete proposal, including economics and addressing all mandatory topics." J.A. 127.

On March 11, 2021, the parties met for a fifth bargaining session but made no progress. Martin restated that the Union would like Troutbrook to sign the IWA but noted that if "you want to put on your deal-making hat, I can come up with as many deals and breaks to come up with [an agreement]" as possible. J.A. 132. Pascucci stressed Troutbrook's preference for a simple, tailored contract. He reaffirmed his intention to negotiate "over a subset of non-economic subjects, then move to another subset, and ultimately move onto economics." J.A. 303.

In a March 30, 2021 letter, Martin claimed that Troutbrook's failure to discuss economic subjects or to provide a counterproposal encompassing all mandatory subjects of bargaining constituted a refusal to bargain in good faith. Pascucci responded that same day, accusing the Union of impeding negotiations by refusing to bargain over Troutbrook's six non-economic counterproposals until the company provided a complete counterproposal.

On April 5, 2021, Martin gave Pascucci notice that the Union would file an unfair-labor-practice charge against Troutbrook with the Board later that day. J.A. 136.

On April 21, 2021, the parties held a final bargaining session, where they rehashed their positions on the mechanics of bargaining and acknowledged that the Board would decide whether Troutbrook's conduct violated the Act.

**B**

On June 17, 2021, the Board's Regional Director filed a complaint against Troutbrook based on the Union's charge. The complaint alleged that the company violated the Act by refusing to provide the Union with a comprehensive counterproposal, restricting the non-economic subjects over which it would bargain, and refusing to bargain over economic subjects until all non-economic subjects were resolved. On August 3, 2021, an Administrative Law Judge ("ALJ") held a remote hearing at which Pascucci and Martin testified about the course of negotiations between the parties. On December 1, 2021, the ALJ found that the Regional Director abandoned the claim that Troutbrook was legally obligated to provide a complete counterproposal. Nevertheless, the ALJ concluded that Troutbrook violated Sections 8(a)(5) and 8(a)(1) of the Act because the company refused to bargain over economic subjects until the parties resolved all non-economic subjects, and it restricted the non-economic subjects over which it would bargain.

Troutbrook appealed to the Board. On December 16, 2022, the Board issued a decision agreeing that the company's refusal to bargain over economic subjects violated the Act. *Troutbrook Co. d/b/a Brooklyn 181 Hosp., LLC & N.Y. Hotel & Motel Trades Council* ("*Troutbrook II*"), 372 N.L.R.B. No. 26, at 4 (Dec. 16, 2022). The Board found it "unnecessary" to address, as potential additional support for the violation, Troutbrook's restrictions on the non-economic subjects it would discuss. *Id.* at 4 n.7. Because it determined that

Troutbrook's conduct "effectively denied the Union its full opportunity to bargain during the entirety of the" year for which the Union had been certified to represent the employees, the Board granted the Union's request for a twelve-month certification extension, to commence on the date the company "begins to bargain in good faith." *Id.* at 6.

Troutbrook timely petitioned for review, and the Board filed a cross-application for enforcement of its decision.

**II**

**A**

"Our review of Board unfair labor practice determinations is quite narrow." *Traction Wholesale Ctr. Co. v. NLRB*, 216 F.3d 92, 99 (D.C. Cir. 2000). "We must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011) (quoting *Mohave Elec. Coop., Inc. v. NLRB*, 206 F.3d 1183, 1188 (D.C. Cir. 2000)). Substantial evidence requires enough "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Micro Pac. Dev. Inc. v. NLRB*, 178 F.3d 1325, 1329 (D.C. Cir. 1999) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Thus, we reverse the Board "only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011) (quoting *United Steelworkers of Am. v. NLRB*, 938 F.2d 240, 244 (D.C. Cir. 1993)).

**B**

Under Section 8(a)(5) of the National Labor Relations Act, an employer commits an unfair labor practice if it "refuse[s] to bargain collectively with the representatives of [its] employees." 29 U.S.C. § 158(a)(5). Such a refusal also violates Section 8(a)(1) of the Act, which prohibits "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of" their rights under the Act, *id.* § 158(a)(1), including the right to "bargain collectively through representatives of their own choosing," *id.* § 157. Per the Act, to "bargain collectively" includes "confer[ring] in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d).

Accordingly, an employer's refusal to discuss any mandatory bargaining subject—a subset of which are referred to as "economic subjects"—may constitute an unfair labor practice. *See NLRB v. Katz*, 369 U.S. 736, 742–43 (1962). Applying that principle, the Board has repeatedly held that an employer violates Sections 8(a)(5) and 8(a)(1) when its refusal to bargain over economic subjects until all non-economic subjects are resolved "unreasonably fragment[s] the negotiations and drastically reduce[s] the parties' bargaining flexibility." *John Wanamaker Phila.*, 279 N.L.R.B. 1034, 1034–35 (1986); *see also S. Shore Hosp.*, 245 N.L.R.B. 848, 857–60 (1979), *enforced*, 630 F.2d 40 (1st Cir. 1980); *Patent Trader, Inc.*, 167 N.L.R.B. 842, 853 (1967), *enforced in relevant part*, 415 F.2d 190 (2d Cir. 1969). The Board has supported those holdings by explaining that "[t]he very nature of collective bargaining presumes that while movement may be slow on some issues, a full discussion of other issues . . . may result in agreement on the stalled issues." *Yama Woodcraft, Inc., d/b/a Cal-Pac. Furniture Mfg. Co.*, 228 N.L.R.B. 1337, 1341 (1977), *enforcement denied on other grounds*, 580 F.2d

942 (9th Cir. 1978). Refusing to discuss mandatory subjects, by contrast, tends to "narrow[] the range of possible compromises." *Patent Trader, Inc.*, 167 N.L.R.B. at 853.

In this appeal, Troutbrook does not contest those legal principles. Instead, it argues that, even accepting those principles, the Board's unfair-labor-practice finding is unsupported by the evidence.

## C

Substantial evidence supports the Board's finding that Troutbrook refused to bargain over mandatory subjects and violated the Act.

As the Board explained, the record shows that the company steadfastly refused to bargain on economic subjects until non-economic subjects were resolved. At the start of negotiations, after rejecting versions of a proposed ground rule tracking Troutbrook's "non-economics first" approach, the Union asked whether the company was "refusing to have meaningful discussion on economics until all non-economic subjects are addressed." *Troutbrook II*, 372 N.L.R.B. No. 26, at 2. Troutbrook did not deny the suggestion. Instead, it declared that "[i]n responding to the Union's proposals, [it] will focus on non-economic subjects first." *Id.*

That pattern continued throughout negotiations. During the third bargaining session, the Union asked when it could expect to receive counterproposals on wages, health benefits, and retirement—three topics Troutbrook does not deny are mandatory subjects of bargaining. Troutbrook responded: "[W]orking on non-economics first, that's our plan." *Id.* When pressed, the company revealed that it had not even discussed any of those three subjects internally. At the fourth bargaining session, the Union restated its request for counterproposals on

"economics, health, [and] wages," noting the difficulty of bargaining effectively without them. J.A. 123. In response, Troutbrook reiterated its intent to "first work through non[-]economics . . . and then eventually work through economics." *Troutbrook II*, 372 N.L.R.B. No. 26, at 4. When the Union explained that coming to an agreement on hours of work—one of the company's six non-economic counterproposals—would be easier if it knew how much workers were getting paid, Troutbrook dismissed the Union's position as "nonsense." J.A. 125. During the fifth bargaining session, Troutbrook once again declared that the parties should "negotiate over a subset of non-economic subjects, then move onto another subset, and ultimately move onto economics" after reaching agreement on non-economic subjects first. J.A. 303; *see generally Troutbrook II*, 372 N.L.R.B. No. 26, at 2–4.

Consistent with Troutbrook's firm stance on bifurcating negotiations, the Board found that over the course of the parties' several bargaining sessions, the company never provided the Union with a single counterproposal on economic subjects. *Troutbrook II*, 372 N.L.R.B. No. 26, at 4. Pascucci confirmed as much in his testimony before the ALJ. *See* J.A. 55 ("Q. [Troutbrook] never provided any proposals on economics, did they? A. We did not.").

The Board also reasonably found that Troutbrook's persistent refusal to discuss economic subjects "unreasonably fragmented the negotiations and drastically reduced the parties' bargaining flexibility." *Troutbrook II*, 372 N.L.R.B. No. 26, at 4 (quoting *John Wanamaker Phila.*, 279 N.L.R.B. at 1034–35). The Board observed that Troutbrook's refusal to discuss economic subjects led the parties to "expend[] significant bargaining time discussing *how* negotiations would be conducted instead of negotiating substantive terms." *Id.*

(emphasis added). The record bears out this effect. *See* J.A. 96 (disputing the priority of non-economic subjects during the second session); J.A. 101–09 (email exchanges between June 4 and June 18, 2020 rehashing the dispute); J.A. 113–14 (debating the relative merits of partial- versus complete-proposal approaches to bargaining during the third session); J.A. 123–24 (same during fourth session); J.A. 132 (same during fifth session); J.A. 142 (same during sixth session). The "foreseeable result," the Board noted, was that "after six bargaining sessions over the course of 11 months, [the parties] failed to reach agreement on a single provision." *Troutbrook II*, 372 N.L.R.B. No. 26, at 4.

For these reasons, we disagree with the dissent's characterization of the Board's decision as resting on a "per se rule" that any "initial" refusal to bargain over economic subjects violates the Act. *See* Dissenting Op. 1. Instead, as the Board summarized, throughout the entire course of bargaining Troutbrook "never provided any counterproposals on economic subjects" and instead "insisted on discussing non-economic subjects first and continued to do so well after it became apparent that its approach was obstructing the parties' ability to make progress towards reaching an agreement." *Troutbrook II*, 372 N.L.R.B. No. 26, at 4.

**D**

Troutbrook contests the Board's decision on several grounds. The company asserts that the Board misunderstood the intent behind its bargaining strategy, disregarded the effects of the Union's conduct, failed to consider the impact of the COVID-19 pandemic, deviated from Board precedent, and improperly sided with the Union's substantive bargaining position. None of these arguments has merit.

14

**1**

Troutbrook does not directly engage with the substantial—indeed, overwhelming—evidence that it refused to discuss economic subjects throughout the course of negotiations. The company instead seizes on Martin's testimony before the ALJ that Pascucci never explicitly stated that he would refuse to discuss economic subjects until *all* non-economic subjects were resolved. Petitioner's Brief 35. But as we have explained, the Board reasonably found, based on the full record, that the company improperly insisted on "adhering to its non-economics-first approach." *Troutbrook II*, 372 N.L.R.B. No. 26, at 4.

Troutbrook's primary argument is that its bargaining strategy did not violate the Act because it was part of "a sincere effort to reach an agreement on [the company's] terms." Petitioner's Brief 28. That claim, even if true, is irrelevant under longstanding Supreme Court precedent. As the Board noted, *Troutbrook II*, 372 N.L.R.B. No. 26, at 5, the Supreme Court explained in *Katz* that "[a] refusal to negotiate *in fact* as to any subject which is within § 8(d), and about which the union seeks to negotiate, violates § 8(a)(5) though the employer has every desire to reach agreement with the union upon an over-all collective agreement and earnestly and in all good faith bargains to that end." 369 U.S. at 743. The Board's precedent reflects this same principle. *See John Wanamaker Phila.*, 279 N.L.R.B. at 1035 (rejecting the view that an employer's refusal to make an economic proposal may be excused if the purpose was to obtain bargaining leverage); *Long Island Jeep, Inc.*, 231 N.L.R.B. 1361, 1367 (1977) ("The law is clear that an employer's willingness to enter into an agreement on its own terms . . . does not preclude a determination that [the] employer has violated its statutory duty

to bargain in good faith where such a finding is reasonably supported by other circumstances.").

**2**

Troutbrook also claims that the Board failed to consider the Union's conduct as part of the totality of circumstances surrounding bargaining. In particular, the company argues that the Board's analysis did not account for the Union's professed intent to sign Troutbrook to the IWA as well as its demand for a complete set of counterproposals before discussing specific topics. The dissent endorses this argument. Dissenting Op. 6–7.

We disagree. To start, neither Troutbrook nor the dissent identifies any Board or judicial decision in which one party's conduct was found to have excused the other's refusal to bargain over mandatory subjects. As the Board put it, no unfair-labor-practice charge was brought against the Union— "the lawfulness of the Union's bargaining actions is" therefore "not at issue here." *Troutbrook II*, 372 N.L.R.B. No. 26, at 5.

In any event, the Board considered the Union's conduct and reasonably concluded that the Union's approach to negotiations did not "somehow excuse[]" Troutbrook's "persistent refusal to bargain over mandatory subjects." *Id.* The Board reasonably found that, unlike Troutbrook, the Union attempted to bargain over all mandatory subjects. As the Board noted, "the Union did not present the IWA on a take-it-or-leave-it basis," and it "repeatedly emphasized its flexibility with respect to both economics and contract wording." *Id.* True enough, at the second bargaining session, Martin initially agreed with Pascucci's statement that the IWA is a "one size fits all" agreement. J.A. 97. But immediately after that exchange, he told Pascucci that "[i]f you raise issues that are legitimate, we'll be flexible on them." J.A. 98; *see Troutbrook*

*II*, 372 N.L.R.B. No. 26, at 19.  At the fourth session, the Union reiterated that "we can bargain flexib[ly]" and that "[w]e should change the IWA for [Troutbrook's] operational needs." *Troutbrook II*, 372 N.L.R.B. No. 26, at 25.  After Troutbrook expressed concerns that the IWA contained "convoluted provisions that are restrictive and expensive," the Union responded:  "Let's bargain over it and talk about it so you don't think it's more convoluted than it is or we can bargain over things to make them less expensive." J.A. 124; *see Troutbrook II*, 372 N.L.R.B. No. 26, at 25.  At the fifth session, the Union took the same position, telling Troutbrook that "[i]f at any time you want to put on your deal-making hat, [we] can come up with as many deals and breaks to come up with [an agreement]." *Troutbrook II*, 372 N.L.R.B. No. 26, at 25.

Troutbrook counters that the Union conditioned any flexibility on the company first agreeing to the IWA in principle.  That argument hinges on a single statement in the Board's brief characterizing the Union's comment during the fifth session.  In the Board's paraphrasing, the Union explained that "if [Troutbrook] expressed a willingness to agree to the IWA, [it] could 'come up with as many deals and breaks' as possible to arrive at an overall agreement." Respondent's Brief 15 (quoting J.A. 132).  Troutbrook seizes on the conditional "if" clause, insisting that it proves the Union's unwillingness to negotiate without a commitment from the company to sign onto the IWA.

Troutbrook is incorrect.  Offering to make deals and provide breaks in exchange for agreeing to the IWA in principle does not necessarily mean that, in the absence of such an agreement, the Union would be inflexible.  In fact, the record demonstrates the Union's broader willingness to negotiate an agreement specific to the company's needs. Martin communicated to Troutbrook after the fifth session that

"the Union remains flexible on nearly every issue, and it is our hope to reach a contract that suits the particularized operation of the Hotel." J.A. 135. Indeed, the Union repeatedly expressed openness to considering proposals that did not draw on the IWA at all if the company were to provide them. And when Troutbrook did provide a few such proposals, the Union negotiated over them.

Relatedly, the record supports the Board's finding that although the Union "consistently sought a full counterproposal from" Troutbrook, it "continued to bargain without one." *Troutbrook II*, 372 N.L.R.B. No. 26, at 5. At the third session, for instance, the Union narrowed its focus and "demonstrated flexibility by requesting proposals specifically relating to wages, health benefits, and retirement benefits." *Id.*; *see also* J.A. 115 (asking for counters on the "holy trinity" of economic subjects). And when Troutbrook refused to engage on those mandatory subjects, the Union still "bargain[ed] over the limited noneconomic proposals the [company] unilaterally chose to present." *Troutbrook II*, 372 N.L.R.B. No. 26, at 5. The notes from the rest of the third session reflect substantive discussions on Troutbrook's counterproposals addressing non-discrimination, the new-employee probationary period, and hours of work. *See* J.A. 115–18.

If anything, contrasting the parties' bargaining conduct only buttresses the Board's holding. The Union and Troutbrook both entered negotiations with strong views on what an agreement should look like and how best to get there. But whereas the Union narrowed its demand for a complete counterproposal and maintained flexibility on its desire to sign Troutbrook onto the IWA in full, Troutbrook never budged on its categorical refusal to discuss mandatory economic subjects until non-economic subjects were resolved. And whereas the Union engaged Troutbrook on the company's non-economic

counterproposals, Troutbrook admitted that it never offered the Union a single counterproposal on economic subjects.

**3**

Troutbrook next contends that the COVID-19 pandemic created an "uncertain economic position" that warranted the company's unwillingness to bargain over economic subjects. Reply Brief 4–5; *see* Petitioner's Brief 22. But even assuming the pandemic could have justified Troutbrook's complete refusal to engage on mandatory economic subjects, the Board reasonably found that the pandemic was not the reason for the company's position. As the Board noted, Troutbrook adopted its bargaining strategy because "it viewed such [an] approach as the most efficient way to negotiate a first contract, not because of economic uncertainty resulting from the pandemic." *Troutbrook II*, 372 N.L.R.B. No. 26, at 6. Pascucci's comments fully support that conclusion. At the parties' February 2, 2021 bargaining session, he stated: "[T]he way I [negotiate a first contract] is first work through noneconomics, get through a half dozen and resolve and then move on to next sets, and then eventually work through economics." *Id.* at 6 n.11. Similarly, in a March 30, 2021 email, he explained: "[I]n my experience having negotiated over 200 collective bargaining agreements, in the overwhelming majority of cases both parties mutually agree to focus on non-economic subjects first, since this is seen as the most efficient way to get to an overall contract, and this has been especially true when negotiating initial contracts in my experience." *Id.* The Board reasonably found that these statements show Troutbrook's bargaining strategy stemmed from Pascucci's standard approach to labor negotiations—one he apparently would have insisted on regardless of the pandemic.

**4**

Contrary to Troutbrook's assertions, the Board's decision does not deviate from its precedent. The company analogizes this case to *Long Island Jeep*, where the Board found no unfair labor practice even though the parties did not bargain over economic issues until their fifth meeting. 231 N.L.R.B. at 1365. But that comparison ignores critical distinctions. The employer there provided the union with a complete economic counterproposal approximately a month after bargaining commenced and just two weeks after the union requested one. *Id.* And although the employer deferred discussion of economic subjects during that month, the union initially appeared to consent to that approach. *See id.* at 1364. In the interim, moreover, the parties reached agreement on several non-economic subjects such that one could hardly describe the bargaining process as unreasonably fragmented. *Id.*; *id.* at 1366 (noting the employer "made substantial concessions to union demands"). None of that is true here.

Relying on *District Hospital Partners, L.P.*, 370 N.L.R.B. No. 118 (Apr. 30, 2021), Troutbrook submits that the Board neglected to consider the Union's failure to test its willingness to negotiate. But the Board vacated that decision last year before reversing itself and finding that the employer engaged in bad-faith bargaining. *See Dist. Hosp. Partners, L.P.*, 372 N.L.R.B. No. 109 (July 25, 2023); *Dist. Hosp. Partners, L.P.*, 373 N.L.R.B. No. 55 (May 8, 2024). And in any event the facts there again look nothing like this case. In its original decision, the Board found that the union declined to test the employer's willingness to bargain because it "summarily rejected" the employer's initial proposal rather than "substantively engaging" with it. 370 N.L.R.B. No. 118, at 8–9. It was therefore unclear whether the employer was inflexible on its bargaining position. Here, by contrast, the record reflects that

after Pascucci initially declared that Troutbrook would not engage on economic subjects, the Union repeatedly, over the course of many months, sought to persuade the company to engage on those mandatory subjects of bargaining. Yet Troutbrook refused.

The additional authorities the dissent cites also do not show that the Board acted arbitrarily in finding a violation on the specific facts of this case. For reasons similar to *District Hospital Partners*, *Captain's Table*, 289 N.L.R.B. 22 (1989), is inapposite. There, the union filed charges when negotiations "had just begun" and the employer had in fact recently provided a "counterproposal regarding wages" as "a starting point for future negotiations." *Id.* at 24. And in *Wyman Gordon Pa., LLC*, 368 N.L.R.B. No. 150 (Dec. 16, 2019), the Board found, on a different record than ours, that the employer's conduct had *not* "frustrated the parties' ability to reach agreement." *Id.* at 5. For all the reasons we have mentioned, the Board reasonably reached the opposite conclusion here. *See Troutbrook II*, 372 N.L.R.B. No. 26, at 6 n.8 (distinguishing *Wyman Gordon* on this basis).

**5**

Finally, Troutbrook claims that the Board's decision "effectively sided with the Union's bargaining strategy, and substantive bargaining position, over Troutbrook's, in violation of Congressional labor policy prohibiting the Board from directly or indirectly compelling concessions or otherwise sitting in judgment on the substantive terms of collective-bargaining agreements." Petitioner's Brief 39. Not so. Nothing in the Board's order obliges the company to concede on any subject or requires the inclusion of any substantive provision in the parties' agreement. The order simply directs

Troutbrook to bargain in good faith on mandatory economic subjects—a remedy consistent with the Act.

## III

For the foregoing reasons, we deny Troutbrook's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*

RAO, *Circuit Judge*, dissenting: During a global pandemic, Troutbrook Company, LLC, began negotiating a collective bargaining agreement with the New York Hotel and Motel Trades Council, AFL-CIO ("Union"). After only several brief bargaining sessions, interrupted by an agreed upon pandemic hiatus, the Union abruptly abandoned negotiations and accused Troutbrook of failing to bargain in good faith. Ignoring the context of the negotiations, the National Labor Relations Board found that Troutbrook committed an unfair labor practice.

The majority enforces the Board's order, relying primarily on deference to the Board's factual findings. But the Board's decision rests on a fundamental misstatement of longstanding legal standards. By failing to consider the totality of the circumstances, the Board creates what is, in effect, a per se rule that an initial refusal to discuss mandatory bargaining subjects will constitute an unfair labor practice. This new rule disrupts the delicate balance between unions and employers protected by Congress and allows the Board to intervene prematurely into the ordinary hurly burly of labor negotiations. Because I would grant Troutbrook's petition for review and set aside the Board's order, I respectfully dissent.

I.

A.

At issue in this case is whether Troutbrook's negotiation strategy constituted an unlawful failure to bargain. To answer this question, the Board was required to consider the totality of the circumstances, a test drawn from the text and structure of the National Labor Relations Act ("NLRA") and fleshed out in Board decisions and our precedents.

The NLRA was enacted to "promote industrial peace" through a regulatory scheme that fosters the creation of "voluntary agreements" between unions and employers. *NLRB*

*v. Am. Nat. Ins. Co.*, 343 U.S. 395, 401–02 (1952); *see also* Pub. L. No. 74-198, 49 Stat. 449 (1935) (codified as amended at 29 U.S.C. §§ 151–69). The NLRA requires "confer[ring] in good faith" over the mandatory subjects of collective bargaining, including "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d); *see also id.* § 158(a)(1), (a)(5), (b)(3). Both parties are responsible for "satisfying the duty to bargain" that is essential to the statutory scheme. *Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 232 (D.C. Cir. 1996); *see also Am. Nat. Ins. Co.*, 343 U.S. at 402.

Yet in Section 8(d) of the NLRA, Congress also recognized the role of private contracting in the collective bargaining process by explicitly providing that good faith bargaining "does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C. § 158(d). Although parties must "confer in good faith" about the subjects of mandatory bargaining, "neither party is legally obligated to yield" in its negotiations. *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 210 (1964) (cleaned up). Section 8(d) "prevent[s] the Board from controlling the settling of the terms of collective bargaining agreements," allowing parties "wide latitude in their negotiations, unrestricted by any governmental power to regulate the substantive solution of their differences." *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 487–88 (1960).

A collective bargaining agreement is of course shaped by the requirements of the NLRA, but the Board's jurisdiction does not extend to dictating the terms of such agreements. Congress left "employers and unions free to set the terms and conditions of employment by mutual consent rather than administrative fiat." *Pac. Mar. Ass'n v. NLRB*, 967 F.3d 878, 893 (D.C. Cir. 2020) (Rao, J., concurring in part and dissenting in part).

3

When determining whether an employer or a union failed to negotiate in good faith, the Board and this court have looked to the totality of the circumstances. "[A] statutory standard such as 'good faith' can have meaning only in its application to the particular facts of a particular case." *Am. Nat. Ins. Co.*, 343 U.S. at 410. The Board must review the "previous relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations [that] constitute the raw facts for reaching such a determination." *South Shore Hosp.*, 245 NLRB 848, 858 (1979) (quoting *Local 833, UAW-AFL-CIO v. NLRB*, 300 F.2d 699, 706 (D.C. Cir. 1962)), *enf'd* 630 F.2d 40 (1st Cir. 1980). Because "an employer's bargaining position is not itself bad faith but only evidence of bad faith," the Board must consider the totality of the circumstances and the parties' entire course of conduct to determine if there was a failure to bargain in good faith. *Cincinnati Newspaper Guild*, *Local 9 v. NLRB*, 938 F.2d 284, 289 (D.C. Cir. 1991). This approach prevents the Board from improperly endorsing the substance of a particular bargaining position in violation of Section 8(d). *See Pub. Serv. Co. of Okla.*, 334 NLRB 487, 487 (2001), *enf'd* 318 F.3d 1173 (10th Cir. 2003).

B.

In contrast to these longstanding principles, the Board concludes that Troutbrook's initial deferral of economic subjects constitutes a per se violation of the Act.[1] *Troutbrook Co., LLC*, 372 NLRB No. 26, at \*1, 3–4 (Dec. 16, 2022). This

---

[1] The majority properly disclaims the creation of a per se rule, which at least minimizes the consequences of the decision and requires the Board to continue to consider the totality of the circumstances in determining whether parties have bargained in good faith. Majority Op. 13.

approach cannot be reconciled with Board and circuit precedent applying the good faith bargaining standard.

As even the cases cited by the majority demonstrate, finding a failure to bargain in good faith requires the Board to examine the entire context of negotiations between the parties. *See* Majority Op. 10–11. In *John Wanamaker Philadelphia*, the Board found a failure to negotiate in good faith only after the employer refused to provide economic terms for seven months, insisted on resolving all non-economic issues first, refused to discuss economic subjects until the Union agreed to certain strike and arbitration principles, and withheld wage and benefit increases during negotiations. 279 NLRB 1034, 1034–35 (1986). The totality of the employer's behavior, which included several unfair labor practices, demonstrated bad faith by "unreasonably fragment[ing] the negotiations." *Id.* at 1035. Similarly in *South Shore Hospital*, the Board found a violation after the employer refused to submit wage and benefit proposals over eighteen bargaining sessions in eight months and demanded the union first agree to benefit reductions. 245 NLRB at 858. The employer's "rigid[]" bargaining approach and conduct showed it "was not dealing with the [u]nion in a serious attempt to resolve their differences and reach a common ground." *Id.* (cleaned up).

The Board and the majority also attempt to ground their finding of a violation in *NLRB v. Katz*, 369 U.S. 736 (1962). *See Troutbrook*, 372 NLRB No. 26, at *3; Majority Op. 10, 14. But that decision is similarly inapposite. *Katz* upheld a per se violation when an employer unilaterally imposed terms of mandatory bargaining on a union. 369 U.S. at 745–47. There is no such unilateral imposition here, and *Katz* "cannot reasonably be read to imply[] that parties must negotiate every term or condition of employment immediately or simultaneously or that it is a *per se* violation of the Act

whenever a party fails to do so." *Troutbrook*, 372 NLRB No. 26, at *14 n.13 (Ring, dissenting).

The NLRA sets forth mandatory subjects for collective bargaining, but does not "regulate the substantive solution" of disagreements between employers and unions. *Ins. Agents' Int'l Union*, 361 U.S. at 488. Persistent and unreasonable failure to consider economic subjects may be evidence of bad faith, but the Board must consider all of the circumstances around collective bargaining before making such a finding.

## II.

The majority emphasizes the narrowness of substantial evidence review. Yet judicial review is not a "rubber-stamp," and courts "bear the responsibility to examine carefully both the Board's findings and its reasoning." *Erie Brush & Mfg. Corp. v. NLRB*, 700 F.3d 17, 21 (D.C. Cir. 2012) (cleaned up). We cannot "abdicate the conventional judicial function … [and] responsibility for assuring that the Board keeps within reasonable grounds." *NCRNC, LLC v. NLRB*, 94 F.4th 67, 72 (D.C. Cir. 2024) (cleaned up). "When reviewing a Board decision, this court must "identify the standard at issue, examine its application in prior adjudications, and then determine whether the instant case is a faithful application of existing law or instead a *sub silentio* revision." *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 476 (D.C. Cir. 2020). And if the Board "entirely fails to consider an important aspect of the problem or offers an explanation … that runs counter to the evidence before the agency," the order must be set aside for "failing to engage in reasoned decisionmaking." *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017) (cleaned up).

By starting with the wrong legal standard, the Board considered only whether Troutbrook refused to initially

6

bargain over economic subjects. The Board's blinkered approach to the evidence failed to consider the bargaining context or to "take into account whatever in the record fairly detract[ed] from" its determination. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Although the Board claimed to consider the totality of the circumstances, it ignored three key facts that undermine the finding of bad faith. Looking at the full picture of the parties' negotiations compels the conclusion that the Board's decision was unreasonable and not supported by substantial evidence.

A.

First, the Board failed to consider Troutbrook's actions within the context of the Union's negotiating position. The Board found that the Union's negotiation tactics were immaterial and emphasized that Troutbrook did not bring an unfair labor practice charge against the Union. *See* Majority Op. 15 (ratifying Board's finding). But Troutbrook should not be penalized for declining to run to the Board in the middle of negotiations. The Union's actions here, although not formally challenged, demonstrated at least some bargaining recalcitrance by offering a "take it or leave it" contract. *Cf. Graphic Arts Int'l Union, Local 280*, 235 NLRB 1084, 1096 (1978) (concluding a "take it or leave it" position by a union was evidence of bad faith), *enf'd* 596 F.2d 904 (9th Cir. 1979); *see also Teamsters Local 418*, 254 NLRB 953, 957 (1981) (explaining that "[t]he insistence of a union on a contract of its own composition, combined with an intransigent attitude during negotiations, supports a finding of bad faith by the Union"). Evaluating the totality of the circumstances includes considering the conduct of both the employer and union, their "approach and attitude toward negotiations[,] as well as [their] specific treatment of items for negotiations." *Patent Trader,*

*Inc.*, 167 NLRB 842, 852 (1967) (cleaned up), *enf'd* 415 F.2d 190 (2d Cir. 1969).

Moreover, the Board gave no weight to the fact that Troutbrook and the Union were negotiating a first contract, and each party had the right to "take an initial bargaining position … and to bargain hard from that point." *NLRB v. CNN America, Inc.*, 865 F.3d 740, 763 (D.C. Cir. 2017); *cf. TruServ Corp. v. NLRB*, 254 F.3d 1105, 1116 (D.C. Cir. 2001) (recognizing that "good-faith, hard bargaining" can lead to impasse on mandatory subjects). First contracts are complex and time consuming to negotiate because the parties are usually starting from scratch, and the resulting agreement will define the future relationship between the parties. The record here demonstrates Troutbrook and the Union engaged in textbook hard bargaining over a first contract. The Union proposed adopting its standard Industry-Wide Agreement ("IWA"), a 157-page contract with 74 articles and 17 attachments.[2] Troutbrook rejected the Union's proposal and instead suggested a standalone agreement tailored for a "small business with a small workforce … currently under severe financial strain" due to the COVID pandemic. Troutbrook also tried to focus initially on non-economic issues to facilitate negotiations.

In the handful of short bargaining sessions, the Union never backed away from using the IWA as a model and

---

[2] The only part of the IWA adapted for Troutbrook, a 13-page memorandum of understanding, included terms that further *limited* the company's future bargaining position by providing it would be bound by any successor IWA and that it would be included in the IWA's multiemployer bargaining unit. *Cf. Charles D. Bonanno Linen Serv., Inc. v. NLRB*, 454 U.S. 404, 405–06, 412 (1982) (explaining the substantial legal obligations that follow from being part of a multiemployer bargaining unit).

demanded a complete counterproposal from Troutbrook in response to its IWA.[3] Troutbrook similarly never backed off its demand "to negotiate its own contract." *Troutbrook*, 372 NLRB No. 26, at *21 (findings of the ALJ). Moreover, the parties made progress on non-economic issues. In the final bargaining session before the pandemic-induced hiatus, the parties "address[ed] non-discrimination, the new-employee probationary period, and hours of work." Majority Op. 17. It was only after the hiatus that the Union stopped discussion of these issues, reiterated its demand for a complete counterproposal to the IWA, and then abandoned negotiations after only two short meetings. *See Troutbrook*, 372 NLRB No. 26, at *15 (Ring, dissenting).

Ultimately, "[t]he test of good faith in bargaining that the Act requires of an employer is not a rigid but a fluctuating one, and is dependent in part upon how a reasonable man might be expected to react to the bargaining attitude displayed by those across the table." *Times Publishing Co.*, 72 NLRB 676, 682–83 (1947). Looking at Troutbrook's negotiating position in context shows lawful hard bargaining on both sides. The record therefore does not support the Board's finding of an unfair labor practice.

## B.

Second, the Board unreasonably ignored the serious effects of the COVID pandemic on Troutbrook's business and ability to offer economic terms.

---

[3] The majority credits the Board's finding that the Union was "flexibl[e] on its desire to sign Troutbrook onto the IWA in full." Majority Op. 17. But the majority points to no evidence in the record that the Union offered to negotiate a standalone agreement.

The Board's approach flies in the face of this court's precedent, which recognizes that evaluating a company's good faith bargaining requires consideration of the "economic exigencies" facing the company. *TruServ Corp.*, 254 F.3d at 1115. Those exigencies were patently obvious—a hotel in New York City during the COVID pandemic faced unprecedented challenges. At almost every session, Troutbrook explained its uncertain economic position and why it sought to prioritize non-economic issues until the business had stabilized. Moreover, a COVID resurgence caused a mutually agreed negotiation hiatus, which lasted seven months. When negotiations resumed, Troutbrook informed the Union that its workforce had decreased from thirty to approximately eight employees, and it could propose only a "lean" economic offer. Troutbrook also promised to send a counterproposal in due course. In the fifth and final session before the Union filed its complaint, Troutbrook reiterated that its financial state was so unstable that it was not "making full payments on [its] loan" and could not provide economic proposals when it did not know what its lender would do.

The Board neither questioned Troutbrook's representations of its dire financial situation nor cited a case in which a company in financial distress was required to provide economic terms for negotiation. Substantial evidence does not support the Board's fact finding when it fails to "take account of anything in the record that fairly detracts from the weight of the evidence supporting the Board's conclusion." *Reno Hilton Resorts v. NLRB*, 196 F.3d 1275, 1282 (D.C. Cir. 1999) (cleaned up). Here, the Board unreasonably glossed over important facts regarding the pandemic's effect on Troutbrook's business and its ability to negotiate economic terms.

C.

Finally, the Board unreasonably failed to consider whether the Union tested Troutbrook's willingness to bargain.

Distinguishing between a permissible negotiation tactic and unlawful bad faith bargaining depends on the course of negotiations. Consequently, a union must test an employer's willingness to bargain before the Board will conclude that the employer failed to bargain in good faith. *Audio Visual Servs. Grp.*, 367 NLRB No. 103, at *6 (Mar. 12, 2019), *aff'd sub nom. Int'l All. of Theatrical Stage Emps. v. NLRB*, 957 F.3d 1006 (9th Cir. 2020); *see also Captain's Table*, 289 NLRB 22, 24 (1988) (requiring a party to participate in the "give and take of negotiations" before alleging a failure to bargain in good faith). Such testing reveals whether a party has a "predetermined resolve not to budge from an initial position." *NLRB v. Truitt Mfg.*, 351 U.S. 149, 154 (1956). When negotiations are brief, the Board generally will not find a party's willingness to bargain has been adequately tested unless there is some evidence of other "unlawful conduct away from the bargaining table that might have affected the negotiations." *Captain's Table*, 289 NLRB at 24.

Reviewing the record, there is little evidence that the Union adequately tested Troutbrook's willingness to bargain. As discussed above, the parties stuck to their initial demands over several bargaining sessions. The Union then filed an unfair labor practice charge after remotely negotiating with Troutbrook for 147 minutes over five sessions in three months.[4] The Union did not allege that Troutbrook engaged in other

---

[4] The parties' sixth bargaining session was short and largely non-substantive, and it was held after the Union filed its complaint with the Board.

unfair labor practices, attempted to undermine the Union, or delayed bargaining beyond the certification year. Instead, the Union hinged its complaint on the time elapsed from the initiation of negotiations without receiving an economic proposal and used this as evidence of Troutbrook's bad faith.

Such scanty negotiations ordinarily will not suffice for testing a party's willingness to bargain.[5] The Board was required to consider whether the Union had adequately tested Troutbrook's willingness to bargain. Finding bad faith bargaining without such a consideration runs afoul of the NLRA's protections for private negotiations and incentivizes a race to the Board when parties are engaged in ordinary hard bargaining.[6]

By disregarding key facts about the collective bargaining context, the Board's decision was arbitrary and capricious and unsupported by substantial evidence.

---

[5] For instance, the Board has held that there was no evidence of a failure to bargain in good faith when an employer's "insistence on resolving noneconomic subjects of bargaining before discussing economic subjects" lasted for a little over a month. *Wyman Gordon Pa., LLC*, 368 NLRB No. 150, at *3–5 (Dec. 16, 2019), *enf'd* 836 F. App'x 1 (D.C. Cir. 2020). Similarly, in *Captain's Table*, the Board determined the willingness of the employer to bargain had not been adequately tested after four months of negotiations. 289 NLRB at 22–24. And in *Kalthia Group Hotels*, *Inc.*, the Board found bad faith after a three-month delay in presenting initial wage and healthcare terms and an eleven-month delay in proposing pension terms, but only in conjunction with the employer using other unlawful and dilatory tactics to erode the union's support. 366 NLRB No. 118, at *18–19 (June 25, 2018).

[6] The Board's rush to decision can harm unions as well as employers. As the Board has observed, "[t]he greater the rewards of

12

\* \* \*

Employers and unions must negotiate in good faith, but that compels neither agreement nor concessions. 29 U.S.C. § 158(d). The Board's hair trigger finding of bad faith bargaining rests on an error of law and fails to consider the totality of the circumstances surrounding Troutbrook's negotiations. I respectfully dissent.

---

recalcitrance … the stronger the probability of indulgence-unto-excess by one or the other." *Graphic Arts Int'l Union*, 235 NLRB at 1095.