# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 10, 2025          Decided June 27, 2025

No. 24-1134

DISTRICT HOSPITAL PARTNERS, L.P., D/B/A GEORGE
WASHINGTON UNIVERSITY HOSPITAL, A LIMITED
PARTNERSHIP AND UHS OF D.C., INC., GENERAL PARTNER,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

1199SEIU UNITED HEALTHCARE WORKERS EAST,
INTERVENOR

———

Consolidated with 24-1165

———

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

———

*Reyburn W. Lominack, III* argued the cause for petitioners.
With him on the briefs were *Steven M. Bernstein* and *Tammie
L. Rattray*.

*Kellie J. Isbell*, Attorney, National Labor Relations Board, argued the cause for respondent. On the brief were *Ruth E. Burdick*, Deputy Associate General Counsel, *Meredith Jason*, Assistant General Counsel, *Kira Dellinger Vol*, Supervisory Attorney, and *Micah P.S. Jost*, Attorney.

*G. Micah Wissinger* argued the cause for intervenor in support of respondent. With him on the brief was *Daniel J. Ratner*.

Before: SRINIVASAN, *Chief Judge*, HENDERSON and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* CHILDS.

CHILDS, *Circuit Judge*: The National Labor Relations Act (NLRA or the Act), 29 U.S.C. § 151 *et seq.*, protects the right of employees to organize and bargain collectively. That protection is more than a paper promise. The Act requires both employers and unions to meet at the table with open minds and a genuine intent to reach agreement. Thus, when one party's proposals abandon compromise and retreat from basic worker protections, the National Labor Relations Board (NLRB or Board) has license to scrutinize that conduct under the Act.

This case arises from the collective-bargaining relationship between a group of entities that manage operations for a local university hospital and a union representing the hospital's service workers. Since 2016, the parties have been engaged in negotiations over a successor agreement. As bargaining wore on, the hospital held fast to a trio of proposals that would have granted it sweeping unilateral control over the terms and conditions of employment, imposed a no-strike clause, and eliminated binding arbitration.

The Board concluded that the hospital's conduct constituted bad faith surface bargaining in violation of Sections

8(a)(1) and 8(a)(5) of the NLRA.  *See* 29 U.S.C. § 158(a)(1), (a)(5).  Applying its settled totality-of-conduct test, the Board found that, when considered together, the hospital's core proposals would have left union employees worse off than if no contract existed at all.  Given this, the Board inferred that the hospital intended to frustrate agreement.  The hospital now petitions for review.

We deny the petition for review and grant the Board's cross-application for enforcement.  The Board's factual findings are supported by substantial evidence, and its legal conclusions are consistent with governing precedent.  Further, the Board did not abuse its discretion by vacating its initial decision due to a panel member's financial conflict of interest or by seating a panel member for the decision under review.  In so holding, we do not reach the Board's alternative grounds.

**I.**

**A.**

In 1935, Congress enacted the NLRA to promote industrial peace and safeguard the rights of workers during a period of profound economic dislocation.  *See* National Labor Relations Act, Pub. L. No. 74-198, 49 Stat. 449 (1935).  As relevant here, the Act "encourages the practice and procedure of collective bargaining" as the means by which labor and management resolve "industrial disputes arising out of differences as to wages, hours, or other working conditions." *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 775 (2023) (citation modified).  Because unequal bargaining power could disrupt commerce and undermine democratic participation in the workplace, Congress charged the NLRB with enforcing these rights and

adjudicating unfair labor practices. *See* 29 U.S.C. §§ 151, 156–158, 160.

Section 7 of the NLRA protects employees' rights to "self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing . . . ." 29 U.S.C. § 157. Two provisions reinforce those rights. Section 8 of the Act makes it "an unfair labor practice" for employers "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157," *id.* § 158(a)(1), or "to refuse to bargain collectively with the representatives of [their] employees," *id.* § 158(a)(5).

Tellingly, the Act defines the duty to bargain as "the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). That obligation does not compel either party to reach an agreement or make specific concessions, but it does require that both parties approach the bargaining process with a genuine intent to reach agreement. *See Teamsters Loc. Union No. 515 v. NLRB*, 906 F.2d 719, 726 (D.C. Cir. 1990). In other words, "rigid adherence to disadvantageous proposals *may* provide a basis for inferring bad faith." *Id.* (emphasis in original) (quoting *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1187, 1188 (D.C. Cir. 1981)).

### B.

Petitioners, District Hospital Partners, L.P., doing business as The George Washington University Hospital, and Universal Health Services, Inc. (UHS) (together, the Hospital), manage and operate a full-service acute care facility in Washington, D.C. For more than two decades, 1199SEIU United Healthcare Workers East, MD/DC Region (the Union), an affiliate of the

Service Employees International Union (SEIU), has represented a bargaining unit of roughly 150 Hospital employees providing essential services critical to operations. Historically, the parties' relationship reflected stability and mutual cooperation. No strikes or picketing occurred, most grievances were resolved short of arbitration, and the two prior labor agreements were reached within a week without legal counsel. That collaborative dynamic shifted markedly when the parties began negotiating for a successor contract to their 2012–2016 collective-bargaining agreement.

Early on, the Hospital expressed its view that the existing collective-bargaining agreement was antiquated and in need of wholesale revision. Over the course of thirty bargaining sessions held between November 2016 and October 2018, the parties' relationship became increasingly strained. At the center of the dispute were three proposals that, in the Union's view, threatened to collectively strip workers of baseline rights they possessed even without a contract: management rights, no-strike protections, and the scope of grievance-and-arbitration procedures.

At the second session in December 2016, the Hospital advanced a proposal for an expanded management rights clause. That proposal reserved the Hospital's rights to: (1) assign unrestricted amounts of bargaining-unit work to supervisors, (2) subcontract personnel services without restriction, (3) search employees without notice, (4) discipline employees without cause, (5) change employee benefits at any time, (6) determine what positions were part of the unit, (7) determine the existence of bargaining-unit work, and (8) determine the extent to which that work could be performed, if at all. The Hospital also proposed a zipper clause, nullifying all past practices not memorialized in the collective-bargaining agreement and crystalizing its authority to "make, change and

enforce rules, regulations and policies governing employment and conduct of employees on the job." J.A. 243.

With its attorney present at the next session, the Union objected to the proposal, explaining that "[n]o hospital in this city" permitted discharge without cause or authorized offensive "[u]nfettered discretion" to search employees. J.A. 549–50. As a mitigation measure, on December 11, the Union directed supervisors not to "review, discuss or sign any petition, or anything that looks like a petition with anyone" warning that "doing so w[ould] disrupt the integrity of the process." J.A. 141, 964.

Despite these concerns, the Union substantively engaged with the Hospital's management rights proposal. On February 1, 2017, it countered by accepting "22 of 26 subsections" in the Hospital's draft while seeking to preserve protections against discretionary subcontracting of bargaining work, unilateral changes to benefits, warrantless searches, and the assignment of bargaining-unit work to non-unit personnel. J.A. 143. The Hospital responded in late March 2017 by reinstating nearly all its original language, modifying its proposal only to state that it would consider "constructive suggestions" at its "sole discretion." J.A. 206.

Negotiations over dispute resolution followed a similar pattern. On March 29, 2017, the Hospital introduced, for the first time, a no-strike provision that would bar employees from engaging in picketing or other concerted economic activity, even if prompted by alleged violations of the collective-bargaining agreement or federal law. That same day, the Hospital also proposed a grievance procedure that would eliminate binding arbitration entirely, permitting only nonbinding mediation—including disputes involving

employee terminations. This represented a significant shift from the Hospital's earlier position.

In January 2017, the Hospital proposed eliminating arbitration for "just cause" protections and removal of any discipline short of discharge from arbitration, limiting progressive discipline only "where appropriate," excluding incidents that the Hospital "deem[ed] as a major infraction of employee conduct or work rules." J.A. 142. On January 31, 2017, the Union submitted a written proposal providing for arbitration of both final written warnings and discharges. The Hospital rejected the proposal later that same day and reiterated that arbitration would be limited to discharges.

On April 5, 2017, tensions between the parties continued to build. In a pointed exchange, the Union relayed that it no longer believed the Hospital was genuinely interested in reaching agreement, though it would continue to bargain in good faith. Afterward, negotiations resumed with the Hospital's discipline counterproposal, which added a requirement to provide timely notice to employees but offered no clarification on whether grievances would be subject to arbitration or merely nonbinding mediation.

The Union responded by requesting that the parties preserve the grievance-and-arbitration provisions from the expired collective-bargaining agreement. It specifically objected to the Hospital's March 29 framework, which eliminated arbitration altogether—even for terminations—and proposed nonbinding mediation as the sole means of resolving disputes. No agreement was reached at the time.

On May 16, 2017, the Union memorialized its growing frustration in writing. It informed the Hospital that its continued insistence on a trio of proposals—a nonbinding

dispute-resolution process, a no-strike clause, and an expansive management rights provision—reflected an intent not to reach agreement, but to further undermine the bargaining process. In response, the Hospital emailed the Union on May 25, expressing that it was revising its earlier discipline proposal to mirror its March 29 position for discharge grievances to proceed only to mediation.

The Union's opposition remained firm. At the July 31 session, the Union reiterated that it would never agree to a successor agreement that did not "provide just cause for disciplin[e] or provide for arbitration" in response to the Hospital's April 5 discipline counterproposal. J.A. 146. Although the parties continued to meet in the months that followed, the Hospital did not materially revise its position on the disputed proposals. At that time, negotiations remained deadlocked.

Nearly ten months later, on March 12, 2018, the Union filed an unfair labor practice charge with the Board. It alleged that the Hospital failed to bargain in good faith, engaging in unlawful surface bargaining by maintaining a set of proposals that, in combination, would have established a one-sided grievance-and-arbitration framework, prohibited protected strike activity, and conferred sweeping unilateral authority on the Hospital.

On June 7, 2018, the Hospital withdrew its no-strike proposal but reserved the right to reinstate it if the parties reached agreement on arbitration. Later, on September 5, 2018, the Union submitted revised proposals on management rights and grievance-and-arbitration procedures, drawing on comparable language that the other hospitals had previously accepted in agreements with the Union. Still, the parties did not reach agreement.

A unit employee first circulated a petition to decertify the Union in March 2018. On October 25, 2018, the Hospital received that petition signed by 81 of the 156 employees in the bargaining unit. On October 26, the Hospital withdrew recognition from the Union via email, canceled all scheduled bargaining sessions, and informed employees that they would now be part of a "non-union team." It then implemented several unilateral changes.

## C.

### 1.

Prompted by the Union's March 2018 filing, the Board's General Counsel issued a complaint alleging that the Hospital violated Sections 8(a)(1) and 8(a) (5) of the NLRA. J.A. 137, 822–30. Following a hearing, an Administrative Law Judge (ALJ) issued a detailed decision sustaining the complaint. J.A. 137–61.

The ALJ concluded, among other things, that "[t]he Hospital ha[d] violated Section 8(a)(5) and (1) of the Act by bargaining in bad faith during negotiations with no intention of reaching a successor collective-bargaining agreement," J.A. 159. Specifically, the ALJ found that the Hospital adhered to proposals reducing employees' rights below the statutory baseline, including a restrictive grievance-arbitration procedure lacking binding arbitration, a no-strike clause, and a broad management rights clause. *Id.* The ALJ also found evidence of regressive bargaining, noting that the Hospital initially proposed discharges be subject to grievance-arbitration and later replaced that with a procedure ending in nonbinding mediation. *Id.*

**2.**

The Board's review of this case unfolded in three phases. In its initial decision, a divided Board reversed the ALJ's finding of surface bargaining, holding that the General Counsel had not established the Hospital's subjective intent to frustrate agreement, concluding instead that the Hospital engaged in lawful hard bargaining. *See Dist. Hosp. Partners, L.P. (DHP I)*, 370 NLRB No. 118, at 1–2, 6–10 (Apr. 30, 2021). The majority emphasized the protracted nature of the negotiations, the Union's acceptance of many management rights provisions, and the volume of proposals exchanged, suggesting these facts were inconsistent with bad faith. *Id.* at 6–10.

Shortly after issuing *DHP I*, the Board learned that then-Member William J. Emanuel, who joined the majority, owned shares in a healthcare mutual fund that included UHS, the Hospital's parent company. *See Dist. Hosp. Partners, L.P. (DHP II)*, 372 NLRB No. 109, at 1 (July 25, 2023). The Board's Designated Agency Ethics Official (DAEO) determined that Member Emanuel should have been disqualified because his "participation violated a criminal statute, 18 U.S.C. § 208(a), and its implementing regulations, 5 C.F.R. § 2640.201(b)(2)(i)." *DHP II*, 372 NLRB No. 109, at 1. As a result, the Board vacated *DHP I* and ordered the case to be reheard by a reconstituted panel. *Id.*

The reconstituted panel included Member David M. Prouty. He confirmed that his past work for a different SEIU affiliate did not create a conflict with this case. J.A. 62 n.1. After consulting the Board's DAEO, Member Prouty determined that his participation would neither raise the appearance of bias nor violate ethics rules. J.A. 62–65. The Board likewise noted that Member Prouty's previous union affiliation was in a different locale and bore no direct

connection to the dispute at hand. *See DHP II*, 372 NLRB No. 109, at 1 n.3, 7 n.22.

On final review, the reconstituted Board adopted the ALJ's findings and conclusions,[1] determining that the Hospital's conduct constituted bad faith bargaining under settled precedent. *See Dist. Hosp. Partners, L.P. (DHP III)*, 373 NLRB No. 55, at 1, 6–7 (2024). The Board ordered the Hospital to recognize and bargain with the Union, rescind the unilateral changes implemented after withdrawing recognition, compensate affected employees, post a remedial notice, and submit periodic reports on bargaining progress—modifying the ALJ's recommended remedy to clarify the Hospital's bargaining obligations and ensure compliance. *Id.* at 12, 14.

The Hospital timely petitioned for review, and the Board filed its cross-application for enforcement thereafter.

## II.

We have jurisdiction to review the Board's decision. 29 U.S.C. § 160(e), (f). While our review of the Board's "unfair labor practice determinations is quite narrow," *Troutbrook Co. v. NLRB*, 107 F.4th 994, 1000 (D.C. Cir. 2024) (quoting *Traction Wholesale Ctr. Co. v. NLRB*, 216 F.3d 92, 99 (D.C. Cir. 2000)), it is not "merely [a] rubber-stamp," *Erie Brush & Mfg. Corp. v. NLRB*, 700 F.3d 17, 21 (D.C. Cir. 2012) (quoting

---

[1] The parties also disputed several other provisions in the Hospital's proposals during bargaining, including disciplinary procedures, union-security clauses, and wages. The Board found that these proposals provided additional indicia of bad faith. *DHP III*, 373 NLRB No. 55, at 8. While those provisions may further support the Board's finding of bad faith in violation of the Act, we confine our review to the Board's assessment of the Hospital's core proposals.

*Avecor, Inc. v. NLRB*, 931 F.2d 924, 928 (D.C. Cir. 1991). "We must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case."[2] *Troutbrook Co.*, 107 F.4th at 1000 (quoting *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011)).

"Substantial evidence requires enough 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* at 1000 (quoting *Micro Pac. Dev., Inc. v. NLRB*, 178 F.3d 1325, 1329 (D.C. Cir. 1999)). We will not "displace the Board's choice between two fairly conflicting views" when evaluating findings of fact, "even though [we] would justifiably have made a different choice had the matter been before [us] de novo." *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 306–07 (D.C. Cir. 2003) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

"We review the Board's procedural rulings for an abuse of discretion." *Napleton 1050, Inc. v. NLRB*, 976 F.3d 30, 39 (D.C. Cir. 2020). That includes our review of "an agency member's decision not to recuse himself from a proceeding[.]" *Metro. Council of NAACP Branches v. FCC*, 46 F.3d 1154,

---

[2] In light of the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), the Hospital urges us to "avoid any inclination to defer to the Board's construction of the duty to bargain in 'good-faith' imposed by the NLRA." Pet'rs' Opening Br. 31 n.15. That argument is waived. "We need not consider cursory arguments made only in a footnote," *Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 414 (D.C. Cir. 2024) (citation modified) (quoting *Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) (en banc)), and the Hospital raises this point only vaguely.

1164 (D.C. Cir. 1995) (citing *Air Line Pilots Ass'n, Int'l v. U.S. Dep't of Transp.*, 899 F.2d 1230, 1232 (D.C. Cir. 1990)).

## III.

The Hospital contends that the Board erred in concluding that its conduct amounted to bad faith surface bargaining in violation of Sections 8(a)(1) and 8(a)(5) of the NLRA. According to the Hospital, it merely tested its leverage through a combination of proposals, seeking substantial, sincere, and justified concessions, while remaining open to discuss positions and entertain counterproposals. It further argues that the Board's findings are unsupported by substantial evidence and conflict with settled precedent. Finally, the Hospital raises two procedural objections: first, to the Board's vacatur of *DHP I* due to Member Emanuel's financial conflict of interest, and second in reseating a Member Prouty in *DHP III*.

We conclude that the Board's findings are fully supported by substantial evidence and that its application of settled law is sound. The record as a whole demonstrates that the Hospital's conduct reflected a broader failure to bargain in good faith under the NLRA. Additionally, the Board did not abuse its discretion by vacating *DHP I* upon discovering Member Emanuel's financial conflict of interest or by seating Member Prouty on the panel in *DHP III*. We address each in turn.[3]

---

[3] Under the presumption that its conduct was lawful hard bargaining, the Hospital contends that it likewise lawfully withdrew recognition from the Union and therefore had no obligation to continue bargaining. Because we sustain the Board's finding of bad faith bargaining, we also uphold the Board's conclusion that the Hospital unlawfully withdrew recognition and unilaterally changed the terms of employment.

14

**A.**

The Board applied its well-established framework,[4] which evaluates "the totality of the employer's conduct." *See Teamsters Loc. Union No. 515*, 906 F.2d at 726 (citations omitted). Total conduct includes "previous relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations [that] constitute the raw facts for reaching such a determination.'" *Loc. 833, Int'l Union, United Auto., Aircraft & Agr. Implement Workers of Am. v. NLRB*, 300 F.2d 699, 706 (D.C. Cir. 1962) (quoting *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 154 (1956) (Frankfurter, J., concurring)). That inquiry distinguishes lawful hard bargaining from surface bargaining—conduct designed "to frustrate the possibility of arriving at any agreement," *Altura Commc'n. Sols., LLC*, 369 NLRB No. 85, slip op. at 1, or aimed at "sabotaging the negotiations to manufacture an impasse while making a show of negotiating in good faith." *ConAgra, Inc. v. NLRB*, 117 F.3d 1435, 1444 (D.C. Cir. 1997).

Although the Board does not compel particular substantive concessions, it may evaluate whether the nature and persistence of a package of bargaining demands reflect an absence of good-faith intent, as measured by objective indicia. *See Reichhold Chems.*, 288 NLRB at 69; *United Steelworkers of Am. v. NLRB*, 441 F.2d 1005, 1010 (D.C. Cir. 1970), *cert.*

---

[4] *See, e.g.*, *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 508 (1960); *Reichhold Chems.*, 288 NLRB 69, 69 (1988), *enforced sub nom. Teamsters Loc. Union No. 515*, 906 F.2d at 719, *cert. denied sub nom. Reichhold Chems. Inc. v. Teamsters Loc. Union No. 515*, 498 U.S. 1053 (1991); *Pub. Serv. Co. of Okla. (PSO)*, 334 NLRB 487, 487–88 (2001), *enforced*, 318 F.3d 1173 (10th Cir. 2003); *Altura Commc'n. Sols., LLC*, 369 NLRB No. 85, slip op. at 1 (May 21, 2020), *enforced mem.*, 848 Fed. Appx. 344 (9th Cir. 2021).

*denied sub nom. Fla. Mach. & Foundry Co. v. NLRB*, 409 U.S. 846, (1971) (observing that a party's insistence upon "a particularly disadvantageous proposal" may infer "some degree of bad-faith"). Such an inference may be warranted where "the employer's proposals, taken as a whole, would leave employees with substantially fewer rights and less protection" than they would enjoy under the Act in the absence of a contract. *PSO*, 334 NLRB at 487–88 & n.4 (collecting cases). In those circumstances, the union may be effectively excluded from meaningful participation in the bargaining process, thereby undermining its statutory role and "stripping it of any meaningful method of representing its members in decisions affecting important conditions of employment and exposing the employer's bad-faith." *Id.* at 488 (citing *A-1 King Size Sandwiches, Inc.*, 265 NLRB 850, 859 n.4 (1982)).

Here, the Board examined a trio of proposals pressed by the Hospital and determined that their cumulative effect would strip the Union's representational role to such a degree as to nearly nullify it. *DHP III*, 373 NLRB No. 55 at 4–5. In the Board's view, even if certain of the individual proposals could be advanced in good-faith as part of the give and take of the bargaining process, the combination of the measures could not reasonably be expected to produce agreement and was in fact "designed to frustrate the collective-bargaining process." *Id.* at 5. Below, we address each of the Hospital's three proposals before turning to their cumulative impact, which was the basis of the Board's ruling. We find that the Board's findings are supported by substantial evidence and well-settled law.

**1.**

We begin with the Board's finding that the Hospital's management rights proposal would have granted it sweeping unilateral control over key terms and conditions of

employment, absent bargaining or proper notice to the Union. That proposal authorized the Hospital to reassign work, subcontract without limit, search employees without notice, impose discipline without cause, alter benefits, and redefine or eliminate bargaining-unit work. *DHP III*, 373 NLRB No. 55, at 4. The inclusion of a zipper clause further broadened that authority by nullifying past practices not expressly included in the agreement. The Board found that these provisions together afforded the Hospital "unfettered discretion to change virtually all aspects of bargaining unit operations[.]" *Id.*

The record supports the Board's view that this combination signaled intent to marginalize the Union. Indisputably, the Union engaged with the proposal, accepted most subsections while preserving key protections, and submitted counteroffers. *Id.* at 3. Yet, after four months without bargaining, in late March 2017, the Hospital reverted to its initial language and simply stated it would consider the Union's suggestions "at its sole discretion." *Id.* The Board reasonably inferred that the Hospital's management rights proposal would have stripped the Union of its statutory right to bargain, without offering anything in return for such a concession. *Id.* at 6.

That inference aligns with Board precedent and our own. This Court has long made clear that "the allocation of work to a bargaining unit is a term and condition of employment," and that "an employer may not unilaterally attempt to divert work away from a bargaining unit without fulfilling its statutory duty to bargain." *Regal Cinemas, Inc.*, 317 F.3d at 311 (quoting *Rd. Sprinkler Fitters Loc. Union No. 669 v. NLRB*, 676 F.2d 826, 831 (D.C. Cir. 1982)). Board precedent echoes that principle, repeatedly condemning proposals that would permit employers "unrestrained license to . . . effectively dissipate unit work" absent input from the union. *Liquor Indus. Bargaining Grp.*,

333 NLRB 1219, 1221 (2001), *enforced*, 50 F. App'x 444 (D.C. Cir. 2002).

Moreover, even a partially revised proposal may support a finding of bad faith if it preserves broad employer discretion and forecloses meaningful union participation. *See Altura Commc'n. Sols., LLC*, 369 NLRB No. 85, slip op. at 5 (explaining that proposals leaving "no avenue to challenge any of the [employer's] decisions" amount to surface bargaining). That was true here. The Hospital's assurance that it would consider the Union's suggestions as it saw fit preserved unilateral control and reflected no genuine move toward compromise.

The Hospital contends that the Board mischaracterized its conduct as surface bargaining. It asserts that the management rights proposal was lawful hard bargaining, offered as a starting point for discussion rather than a final demand, and that it made itself available to explain the proposal. Pet'rs' Opening Br. 35–36. The Hospital also cites its responses to the Union's counteroffers, revisions to its proposal, and eventual agreement on provisions the Union accepted. *Id.* at 36.

But the Hospital misunderstands the standard. Mere insistence on a management rights clause is not necessarily unlawful. *See Teamsters Loc. Union No. 515*, 906 F.2d at 726 ("Adamant insistence on a bargaining position . . . is not in itself a refusal to bargain in good faith."). Nor is it improper for a union to trade limitations for gains elsewhere. *See Hydrotherm, Inc.*, 302 NLRB 990, 994 (1991). But where, as here, an employer presses for near-total control without offering meaningful concessions, the Board may reasonably infer an intent to frustrate agreement. *See PSO*, 334 NLRB 487, 487 (2001).

Accordingly, substantial evidence and settled law supports the Board's conclusion that this proposal, and the surrounding conduct contributed to a finding of bad faith bargaining.

**2.**

We next consider the Board's finding that the Hospital's no-strike proposal reflected bad faith bargaining. Introduced months into negotiations and paired with a sweeping management rights clause, the proposal broadly prohibited concerted economic activity. *DHP III*, 373 NLRB No. 55, at 5. The Board reasonably explained that this proposal sought "unfettered unilateral rights . . . and the unconditional surrender of the employee's statutory right to strike, picket, or use economic weapons to contest, change, or ameliorate the [Hospital's] conduct." *Id.* Although the Hospital withdrew the proposal after the Union filed an unfair labor practice charge, it expressly reserved the right to reinstate it. *Id.* at 4. Viewed in context, the Board reasonably inferred that the Hospital's timing and conditional nature of the withdrawal underscored a lack of genuine bargaining intent.

The Hospital responds that the Board misunderstood the scope of its proposal. It argues that the no-strike provision simply carried forward the "no-strikes or lockouts" clause from the prior agreement and did not overreach. The Hospital also claims the clause imposed mutual restraints and that its withdrawal in June 2018 reflected a good-faith effort to compromise.

The Board's reasoning accords with established law. Longstanding precedent makes clear that a no-strike clause is typically exchanged for a binding dispute-resolution mechanism—a quid pro quo balancing employee rights and employer interests. *Id.* at 6 (first citing *Textile Workers v.*

*Lincoln Mills*, 353 U.S. 448, 455 (1957) ("[T]he agreement to arbitrate grievance disputes is the quid pro quo for an agreement not to strike"); and then *United Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564, 567 (1960) ("[O]ne is the quid pro quo for the other")). The Hospital's proposal upset that balance by pairing a broad no-strike clause with the elimination of binding arbitration. This grouping effectively insulated the Hospital from meaningful challenges. As the Board reasonably found, that combination would have left the Union with no viable means of protest or enforcement, depriving it of a core statutory function and rendering its role effectively illusory. *See PSO*, 334 NLRB, at 488.

Moreover, the negotiation context further supports the Board's conclusion. The Board reasonably explained that, by pairing the no-strike proposal with the simultaneous elimination of binding arbitration, the Hospital would have "stripped the Union of its statutory right to strike and rejected any commitment to arbitrate disputes." *DHP III*, 373 NLRB No. 55, at 6. Importantly, while the parties had previously agreed to a no-strike clause as part of a balanced agreement that included binding arbitration, here the Hospital proposed a no-strike obligation while simultaneously eliminating that dispute-resolution mechanism. The absence of such balance reflected an intent to frustrate the possibility of agreement.

Viewed in this light, the Board's factual findings were supported by substantial evidence, and its error free legal conclusions reflect a proper application of settled law.

**3.**

Next, we evaluate the Board's finding that the Hospital's grievance-and-mediation proposal reflected bad faith bargaining. The proposal eliminated binding arbitration and

substituted nonbinding mediation for all disputes involving terminations, marking a substantial retreat from the Hospital's earlier positions. *DHP III*, 373 NLRB No. 55, at 3. That change left employees without a meaningful mechanism to challenge adverse actions. *Id.* at 5.

After introducing the arbitration-eliminating proposal on March 29, 2017, the Hospital revised its discipline proposal on May 25 to align with a mediation-only model. *Id.* at 3–5. Despite repeated objections from the Union, the Hospital maintained that position through June 7, 2018. The Board reasonably concluded that this sustained insistence supported an inference of bad faith.

The Hospital responds that arbitration was not categorically foreclosed. It claims the Union could have tested its flexibility through counterproposals. It also points to its January 2017 discipline proposal, which included arbitration for discharges, as evidence of compromise.

The Board's reasoning is consistent with established law. As the Board has long recognized, regressive proposals—those that materially reduce or retract previous offers—may evidence bad faith where they are unjustified. *See Mid-Continent Concrete*, 336 NLRB 258, 260 (2001) ("Where the proponent of a regressive proposal fails to provide an explanation for it . . . the Board may weigh that factor in determining whether there has been bad faith bargaining."), *enforced*, 308 F.3d 859 (8th Cir. 2002). The Hospital's shift to nonbinding mediation fits that pattern. Its reliance on an earlier proposal that included arbitration is unavailing given that it later withdrew that offer and held firm to a mediation-only stance for over a year. The Board properly focused on the Hospital's final positions and sustained conduct, rather than on preliminary offers it later abandoned.

Moreover, the Board reasonably declined to penalize the Union for not making counterproposals on the grievance proposal. The Union had already objected to the Hospital's position, and the ALJ credited testimony that further discussion would have been futile. As this Court has explained, a union "should not be compelled to continue the charade for more sessions" where the employer has clearly signaled that further bargaining would be fruitless. *NLRB v. Wright Motors, Inc.*, 603 F.2d 604, 608 (D.C. Cir. 1979).

Thus, the Board's view that the Hospital's proposal precluded the employees and the Union from securing a binding dispute-resolution mechanism for addressing alleged violations of the agreement is both factually supported and legally sound.

**4.**

Finally, we review the Board's finding that the Hospital's maintenance of its trio of proposals over fourteen months reflected bad faith bargaining. The record shows that the Union regularly attended sessions, raised objections, and made concessions, while the Hospital maintained largely unchanged positions. The Board credited the Union's May 2017 letter expressing that the Hospital's intransigence signaled an intent to subvert bargaining. *DHP III*, 373 NLRB No. 55, at 5. Viewed in light of the full bargaining history, the Board reasonably inferred that this conduct constituted surface bargaining.

The cumulative impact of these proposals supports the Board's inference of bad faith. The Union would have been required "to cede substantially all of its representational function," destroying the Union's "ability to function as the

employees' bargaining representative," suggesting the Hospital "could not seriously have expected meaningful collective bargaining." *Id.* at 7 n.14 (quoting *PSO*, 334 NLRB at 489). The management rights clause conferred unfettered discretion over bargaining-unit work, the no-strike clause prohibited all protest activity, and the grievance procedure offered no viable mechanism to challenge management decisions. Together, these terms would have left employees "with fewer rights than they would have without a contract"— a hallmark of surface bargaining. *See id.*; *Target Rock*, 324 NLRB 373, 386 (1997), *enforced*, 172 F.3d 921 (D.C. Cir. 1998) ("An employer acts in bad faith when . . . it simultaneously insists on a broad management rights clause, a no-strike provision, and no effective grievance-and-arbitration procedure.").

The Board's conclusion aligns with settled law. Courts and the Board alike have found that simultaneous insistence on these provisions, especially when maintained throughout the bargaining period, signals bad faith. *See PSO*, 334 NLRB at 487–88; *Wright Motors, Inc.*, 603 F.2d at 608. Although the Hospital withdrew the no-strike clause in June 2018, that retreat followed the Union's unfair labor practice charge and did not cure the pattern of obstruction. *See DHP III*, 373 NLRB No. 55, at 7. An employer cannot erase bad faith by offering concessions only after legal intervention.

Thus, the Board's view that the Hospital's maintenance of its triad of proposals amounted to surface bargaining is both factually supported and legally sound.

\*\*\*\*

Overall, we uphold the Board's determinations that the Hospital's conduct amounted to bad faith surface bargaining in violation of Sections 8(a)(1) and 8(a)(5) of the NLRA.

**B.**

**1.**

The Hospital contends that the Board erred by vacating its 2021 decision in *DHP I*, which reversed the ALJ's finding of surface bargaining. The Board vacated that decision after discovering that then–Board Member Emanuel, who joined the majority in *DHP I*, owned stock in UHS, the Hospital's parent company. The Hospital argues that vacatur was unnecessary because there is no evidence that Member Emanuel was aware of the conflict or that it influenced the outcome.

That argument misses the mark. Federal law categorically bars government officials from participating in matters in which they or their families hold a financial interest— irrespective of actual bias or knowledge. *See* 18 U.S.C. § 208(a); *see also* 5 C.F.R. § 2635.402(a), (b)(1)(ii). The Supreme Court has emphasized that the Due Process Clause requires not only actual fairness in adjudication, but also the appearance of fairness. *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883–84 (2009). In *Caperton*, the Court held that due process is violated when an adjudicator's financial interest creates a "possible temptation" to rule for one party—even in the absence of clear proof of bias. *Id.* at 886. *Caperton* teaches that recusal is required where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Id.* at 872 (citation omitted).

The same principle applies in administrative adjudication. In *Metro. Council of NAACP Branches v. FCC*, we rejected a

challenge to an agency's decision based on allegations of bias, explaining that recusal claims must rest on specific evidence of actual bias, rather than generalized concerns about fairness. 46 F.3d 1154, 1164–65 (D.C. Cir. 1995). Nevertheless, *Metro. Council* does not suggest that recusal is required only when specific evidence of actual bias exists. Rather, as *Caperton* makes clear, both statutory ethics rules and constitutional standards demand recusal when a decisionmaker's financial interests create a risk of bias that is too high to be tolerated.

Here, the Board acted well within its discretion in vacating *DHP I*. Once Member Emanuel's conflict came to light, the Board promptly vacated its decision to preserve the integrity of its proceedings and demonstrate its commitment to fair adjudication. *See In re NLRB*, 304 U.S. 486, 494 (1938); *DHP II*, 372 NLRB No. 109, at 8. In doing so, the Board expressly acknowledged *ExxonMobil Rsch. & Eng'g Co.*, 371 NLRB No. 128 (2022), explaining that vacatur was necessary to uphold public confidence in agency decision-making and to demonstrate the Board's integrity. *DHP II*, 372 NLRB No. 109, at 2–4.

Therefore, the Board acted within its discretion in vacating *DHP I*, and complied with both statutory ethics requirements and constitutional standards of due process.

**2.**

The Hospital also argues that Member David Prouty should have been disqualified from participating in *DHP III* because of his prior role as general counsel to SEIU Local 32BJ, an affiliate of the Union's parent organization. It claims that this history created an appearance of bias.

This argument is unpersuasive. As the Board explained in *DHP II*, Member Prouty's former role with SEIU 32BJ involved a different geographic region with no direct involvement in this dispute. 372 NLRB No. 109, at 1–2 & n.3 (referencing Member Prouty's opinion with the Notice to Show Cause). Member Prouty himself clarified that his past representation of a different union affiliate did not create a conflict in this matter. J.A. 62 n.1. Moreover, after consulting the Board's DAEO, Member Prouty reasonably concluded that his participation would not create an appearance of bias or violate ethics standards. J.A. 62–65.

The Board's conclusion that there was no actual conflict, no personal interest, and no statutory or regulatory basis for disqualification was well within its discretion. *DHP II*, 372 NLRB No. 109 at 7 n.22. That conclusion aligns with DAEO guidance and the standards under 5 C.F.R. § 2635.502, which provides that past employment alone does not automatically create an appearance of bias; rather, the analysis depends on whether the former employer is a party to the matter or maintains a close personal relationship that could reasonably raise questions about impartiality. The Hospital has not even attempted to suggest that either circumstance is present here.

Further, the Board's approach is consistent with general principles of administrative law. *See Napleton 1050, Inc.*, 976 F.3d at 39 (reviewing the agency's "procedural rulings for an abuse of discretion"). Here, a far cry from issuing a perfunctory decision, the Board in *DHP III* undertook a comprehensive reevaluation of the record. It adopted the ALJ's findings in full, reaffirmed the ALJ's credibility determinations, and carefully applied the legal standards set forth in *PSO* and *Altura Commc'n. Sols., LLC. See DHP III*, 373 NLRB No. 55, at 2–8.

In light of these facts, Member Prouty's participation in *DHP III* was lawful, appropriate, and did not impair the fairness or validity of the Board's decision.

## IV.

We deny the Hospital's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*